VILLANTI, Judge.
Branch Banking & Trust Co. (BB & T) seeks review of the final judgment entered in favor of Kraz, LLC, Bing Charles Kear-ney, Jr., and Tracy L. Harris, Jr., (collectively Kraz) in this commercial foreclosure case. Of the twelve issues raised by BB & T, only one has merit, and we reverse the final judgment solely to the extent that it awarded a credit against Kraz’s loan principal for amounts BB & T may have received during the pendency of the foreclosure proceedings pursuant to a Commercial Shared Loss Agreement with the Federal Deposit Insurance Corporation (FDIC). In all other respects, we affirm.
This case comes to us with a lengthy record. However, for purposes of this opinion, the relevant facts are fairly straightforward. BB & T purchased Kraz’s $5,182,128 commercial construction loan, along with numerous other assets, from the FDIC after Colonial Bank, which originated the loan, was closed by the FDIC. The purchase agreement between BB & T and the FDIC included a provision called a Commercial Shared Loss Agreement, which set forth the means by which BB & T and the FDIC would share in any losses that arose from the Colonial loans[1] that BB & T purchased. Under the Commercial Shared Loss Agreement, BB & T was required to submit a quarterly report listing the losses it had sustained during that quarter due to charge-offs taken on the entire pool of Colonial loans, and the Commercial Shared Loss Agreement required the FDIC to pay BB & T a stated percentage of those losses. BB & T was also required to submit a second report detailing any “recoveries,” which were defined as collections received during the quarter on the entire pool of shared loss loans that had been previously charged off. If the amount of net recoveries was positive, BB & T was required to pay a stated percentage of those recoveries to the FDIC.[2] Thus, if BB & T charged off a loan in one quarter, it could include that loan in the charge-off pool for the quarter and it would be paid a portion of that loss by the FDIC. However, if BB & T made a recovery on that charged-off loan in a subsequent quarter, BB & T would essentially have to reimburse the FDIC for the earlier payment by including that recovery on its quarterly report and paying a portion of the recovery to the FDIC.
Shortly after BB & T purchased Colonial’s assets, it declared the Kraz loan to be in default and it filed a foreclosure action against Kraz. During the foreclosure proceedings, a court-appointed receiver collected tenant rents, paid certain expenses, and managed the property in consultation with BB & T. The receiver transmitted the net collected rents to BB & T after the receiver himself was paid, and presumably BB & T applied these funds to reduce Kraz’s indebtedness.
At the trial on the foreclosure complaint, BB & T’s corporate representative, Oscar *275 Bruni, admitted that BB & T “may have” received payment under the Commercial Shared Loss Agreement as a result of the default declared on the Kraz loan. Bruni testified that he would have to make a telephone call to BB & T’s accounting department to determine for sure whether any such payment had been received and the exact amount of the payment; however, no one asked Bruni to make this call. Kraz’s banking expert, James Howard, testified that BB & T’s shared loss payment on the loan could be “as much as $1.8 million.” However, neither Bruni nor any other witness testified as to whether, in fact, BB & T had received such a payment and, if so, what the exact amount of the payment was.
At the conclusion of the foreclosure trial, the trial court found that Kraz had not been in default under the terms of the loan when BB & T declared the default. Having reached this conclusion, the trial court denied BB & T’s request to foreclose on the property, and it set about creating an equitable remedy that would return the parties to the financial positions they would have been in had the improper default not been declared. As part of that remedy, the trial court reinstated the loan, ordered BB & T to write off the default interest and late fees it had charged, and ordered an accounting of the funds turned over to BB & T by the receiver during the course of the foreclosure proceedings. In addition, the court ordered BB & T to credit the principal of the Kraz loan with the shared loss payment that BB & T had allegedly received on this loan pursuant to the Commercial Shared Loss Agreement. Specifically, the trial court ordered
that [BB & T] shall, within thirty (30) days of the entry of this Final Judgment, credit the principal of the Note with all payments received by [BB & T] from the FDIC concerning this loan per Mr. Bruni’s and Mr. Howard’s testimony.... No payments shall be due from [Kraz] until [BB & T] credits all such payments it has received against the principal....
The stated purpose of this credit was to prevent BB & T from “double-dipping” by receiving payments on the loan both from the FDIC and Kraz.
In this appeal, BB & T argues, among other things,[3] that the credit ordered for the alleged shared loss payment constituted an abuse of discretion. On this single issue, we agree because Kraz presented no evidence to establish that BB & T actually received any payment under the Commercial Shared Loss Agreement based on a charge-off of the Kraz loan. Instead, the only testimony was that it was possible that BB & T may have received a payment of as much as $1.8 million from *276 the FDIC but that further evidence would be needed to be sure. This testimony is legally insufficient to support a finding that BB & T had, in fact, received a payment of $1.8 million as a result of charge-offs on the Kraz loan. See, e.g., Taylor v. Lee, 884 So.2d 222, 224 (Fla. 2d DCA 2004) (“ ‘[TJhere must be some reasonable basis in the evidence to support the amount [of damages] awarded.’ ” (quoting Camper Corral, Inc. v. Perantoni, 801 So.2d 990, 991 (Fla. 2d DCA 2001)) (alteration in original)); Schimpf v. Reger, 691 So.2d 579, 580 (Fla. 2d DCA 1997) (“Damages cannot be based upon speculation and guesswork, ... but must have some reasonable basis in fact.”). Thus, in the absence of any legally sufficient evidence to support this credit against the principal of Kraz’s loan, we must reverse this portion of the final judgment and remand for correction.
While we base our reversal on the lack of evidence to support this credit, we also note that even if Kraz had presented additional evidence concerning BB & T’s receipt of funds from the FDIC, the terms of the Commercial Shared Loss Agreement would not support the trial court’s decision to award a credit based on that payment because the Commercial Shared Loss Agreement specifically requires BB & T to reimburse the FDIC if it makes any recovery on the note from Kraz. As discussed above, the Commercial Shared Loss Agreement requires BB & T to reimburse the FDIC for recoveries it makes on loans that were charged off in prior quarters. Thus, if Kraz makes payments on the reinstated loan, those payments would constitute “recoveries” under the Commercial Shared Loss Agreement, and BB & T would be required to repay the FDIC based on those recoveries. Hence, even assuming that BB & T in fact received $1.8 million from the FDIC for charge-offs on the Kraz loan, BB & T will not receive a windfall when Kraz makes payments on the loan because BB & T will be required to reimburse the FDIC to the extent of those payments. The trial court’s rationale for ordering this credit — to prevent BB & T from “double-dipping” — is erroneous because the Commercial Shared Loss Agreement prevents such double-dipping by its own terms.
Moreover, we agree with BB & T that if a borrower could have the principal of his or her loan reduced due to a shared loss payment received from the FDIC during the course of foreclosure proceedings, then FDIC-regulated sales of closed banks’ assets would come to a halt. If the possibility existed that a trial court, using its legal or equitable powers, could grant the relief given Kraz in this case, no bank purchasing a closed bank’s loans would take seriously its responsibility to attempt to collect on those loans. Ironically, the relief afforded to Kraz by the trial court actually results in double-dipping in reverse — with the purchasing bank being compelled to both forgive the debtor for that portion of the debt paid by the FDIC and also repay the FDIC for the forgiven amount. Such a result turns the concept of equity on its head.
In sum, we hold that to the extent that the final judgment ordered BB & T to reduce the principal balance due from Kraz by any shared loss payment BB & T allegedly received from the FDIC, that judgment constituted an abuse of discretion. Accordingly, we reverse on this basis and remand for correction of this portion of the final judgment. In all other respects, we affirm.
Affirmed in part, reversed in part, and remanded for further proceedings.
CASANUEVA and KELLY, JJ., Concur.

. The Commercial Shared Loss Agreement, which is a complex twenty-seven-page document, applies to residential and commercial loans, real estate, and certain securities purchased by BB & T from the FDIC. For purposes of this opinion, however, we focus solely on the provisions relating to BB & T’s purchase of residential and commercial loans from the FDIC.

. Because the Commercial Shared Loss Agreement allowed BB & T to deduct the expenses incurred in obtaining quarterly recoveries from the amount of gross recoveries received in the same quarter, it was possible that net recoveries in any one quarterly period could be negative.

. In addition to its initial brief and reply brief, BB & T submitted a fourteen-page "Motion to Certify Question” approximately one week before oral argument. This motion, which included two exhibits as additional evidence, included numerous arguments raised for the first time concerning the impropriety of the credit for the alleged shared loss payment. Because these arguments were not raised in BB & T’s initial brief, they are not properly before this court. Cf. Polyglycoat Corp. v. Hirsch Distribs., Inc., 442 So.2d 958, 960 (Fla. 4th DCA 1983) ("When points, positions, facts and supporting authorities are omitted from the brief, a court is entitled to believe that such are waived, abandoned, or deemed by counsel to be unworthy.”). Further, the exhibits attached to this motion as additional evidence are not properly before this court. See, e.g., Supinski v. Omni Healthcare, P.A., 853 So.2d 526, 532 n. 2 (Fla. 5th DCA 2003) ("It is elemental that appellate courts will not consider evidence that was not presented to the trial court for its consideration in making its decisions.”); Hillsborough Cnty. Bd. of Cnty. Comm'rs v. Pub. Employees Relations Comm’n, 424 So.2d 132, 134 (Fla. 1st DCA 1982) (same). Thus, while we have read these materials, they have played no part in our decision.